Lorelyn Peñero MILLER, Appellant,

v.

Warren CHRISTOPHER, Secretary
of State, Appellee.

No. 94–5160.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 21, 1995.

Decided Oct. 8, 1996.

Donald R. Patterson, Tyler, TX, argued
the cause, and filed the briefs, for appellant.

John O. Birch, Assistant United States
Attorney, with whom Eric H. Holder, Jr.,

United States Attorney, and R. Craig Lawrence, Assistant United States Attorney, were on the brief, argued the cause, for appellee. John D. Bates and Douglas A. Wickham, Assistant United States Attorneys, Washington, DC, entered appearances, for appellee.

Before WALD and HENDERSON, Circuit Judges, and BUCKLEY,\* Senior Circuit Judge.

Opinion for the court filed by Senior Circuit Judge BUCKLEY.

Separate opinion concurring in the judgment filed by Circuit Judge WALD.

BUCKLEY, Senior Circuit Judge:

Lorelyn Peñero Miller, a nonresident alien, appeals the dismissal of her complaint for lack of Article III standing and challenges the constitutionality, on equal protection grounds, of a statute governing the citizenship of an illegitimate child born abroad of an American father and an alien mother. We hold that Ms. Miller had standing to bring this action; but in light of controlling Supreme Court precedent, we conclude that the challenged statute is constitutional.

## I. BACKGROUND

Ms. Miller was born in Angeles City, Republic of the Philippines, on June 20, 1970. Her birth certificate states that Ms. Miller was illegitimate; and it identifies her mother as Luz Peñero, a Filipino national. It does not identify her father. Ms. Miller claims that she is the daughter of Charlie R. Miller, a U.S. citizen, who, at the time of her birth, was a member of the U.S. military stationed in the Philippines. Mr. Miller and Luz Peñero have never married.

In February 1992, eight months after Ms. Miller's 21st birthday, she applied to the U.S. State Department for registration as a United States citizen. In her complaint, Ms. Miller stated that she was "a ... resident of the Angeles City, Republic of the Philippines." First Amended Complaint at 1. The

record does not reveal whether she has ever been to the United States.

In 1992, the State Department denied Ms. Miller's application for U.S. citizenship on the ground that she failed to meet the requirements of the provision of the Immigration and Naturalization Act of 1952 ("Act"), 8 U.S.C. § 1409(a), which applies to persons born out of wedlock outside the United States of an American father and an alien mother. As amended in 1988, section 1409(a) provides that such a child will be deemed a U.S. citizen as of the date of birth if:

(1) a blood relationship between the person and the father is established by clear and convincing evidence,

(2) the father had the nationality of the United States at the time of the person's birth,

(3) the father (unless deceased) has agreed in writing to provide financial support for the person until the person reaches the age of 18 years, and

(4) while the person is under the age of 18 years—

(A) the person is legitimated under the law of the person's residence or domicile,

(B) the father acknowledges paternity of the person in writing under oath, or

(C) the paternity of the person is established by adjudication of a competent court.

8 U.S.C. § 1409(a) (1994). Because she falls within a narrow statutory age bracket, Ms. Miller would be able to satisfy the requirement of section 1409(a)(4) on a showing that she was legitimated prior to the age of 21, rather than 18, as provided under the section before it was amended in 1986. See 8 U.S.C. § 1409 note (Effective Date of 1986 Amendment). The State Department found that Ms. Miller failed to meet the requirements of subsections (3) and (4) of section 1409(a). See Miller v. Christopher, 870 F.Supp. 1 (D.D.C.1994) ("Mem. Op.") at 2.

On July 27, 1992, Mr. Miller obtained a Voluntary Paternity Decree from a Texas

---

\* At the time of oral argument, Judge Buckley was a circuit judge in active service. He as-   sumed senior status on September 1, 1996.

state court, establishing that he was Ms. Miller's biological father. Ms. Miller submitted that document to the State Department and requested reconsideration of its denial of her application. Ms. Miller then sought judicial review of her claim in the United States District Court for the Eastern District of Texas. In that action, she named the Secretary of State ("Secretary") as defendant. Ms. Miller's complaint charged that the statutory prerequisites to her application for U.S. citizenship contained in 8 U.S.C. § 1409(a) violated the Constitution's equal protection principles because of the statute's distinctions between legitimate and illegitimate children and between men and women. Complaint ¶ XII(1). Ms. Miller sought a declaration that she "is a citizen of the United States and is entitled to all the rights and privileges of citizens of the United States including a right to possess a passport." First Amended Complaint ¶ XVII(2).

The Secretary moved to dismiss the complaint or, in the alternative, to transfer venue. Thereupon, Ms. Miller amended the complaint, adding Mr. Miller, a resident of Texas, as co-plaintiff. On June 2, 1993, the district court in Texas dismissed Mr. Miller's claims for lack of standing and ordered that the case be transferred to the United States District Court for the District of Columbia, where venue, based on the Secretary's residence, was proper. *Miller v. Christopher*, C.A. No. 6: 93 CV 39 (E.D. Tex. June 2, 1993). Upon transfer, the Secretary renewed his motion to dismiss. By Memorandum Opinion and Order dated April 29, 1994, the district court granted the Secretary's motion to dismiss on the basis that Ms. Miller lacked standing. Mem. Op. at 5.

Ms. Miller presents three core issues on appeal. She argues, first, that the district court erred in finding that she lacked standing; second, that section 1409(a) violates the Equal Protection Clause of the Fourteenth Amendment; and, finally, that, even if the court upholds the constitutionality of section 1409(a), she meets its requirements because the Texas state court paternity decree retroactively legitimated her as of the date of her birth.

We address these arguments in turn.

## II. DISCUSSION

### A. Standing

Article III of the United States Constitution requires plaintiffs invoking federal jurisdiction to establish three elements of standing:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly trace[able] to the challenged action of the defendant, and not th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal quotation marks, citations, ellipses, and footnote omitted).

█ As the existence of the first two elements is conceded, the issue before us involves the third—whether Ms. Miller's injury is redressable by a favorable decision. Although the district court found that Ms. Miller may have suffered an injury that was caused by the conduct of the Secretary, it concluded that Ms. Miller did not have standing to bring this action. Specifically, the court held that she had failed to "demonstrate any redressable injury" because, under *INS v. Pangilinan*, 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988), federal courts do not have the power to "grant citizenship." Mem. Op. at 3 (citing *Pangilinan*, 486 U.S. at 884, 108 S.Ct. at 2216). The court reasoned that

> [e]ven if this court should conclude that 8 U.S.C. § 1409(a) is unconstitutional, this court could not grant citizenship to plaintiff [because, under *Pangilinan*,] this could only be accomplished by legislative action. Only Congress has the power to confer citizenship to persons

not constitutionally entitled to citizenship.

*Id.*

We respectfully disagree. In determining whether an injury is redressable, a court must ask "whether a plaintiff's injury would be likely to be redressed *if the requested relief were granted.*" *In re Thornburgh,* 869 F.2d 1503, 1511 (D.C.Cir.1989) (emphasis in original). Ms. Miller did not request the court to *grant* her citizenship; rather, she requested that the court declare section 1409(a) unconstitutional and merely make a *finding* under the general rule applicable to persons born outside of the United States, 8 U.S.C. § 1401(g), that she was a U.S. citizen from birth. Section 1401(g) provides, in pertinent part:

> The following shall be nationals and citizens of the United States at birth:
>
>     \*     \*     \*     \*     \*     \*
>
> (g) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years....

8 U.S.C. § 1401(g) (1994).

We agree with Ms. Miller that, if the district court had held section 1409(a) to be unconstitutional, it could have found that she was a U.S. citizen pursuant to section 1401(g). Such a finding would not have violated *Pangilinan*'s proscription on the exercise of judicial equitable power to confer U.S. citizenship in the absence of legislative authority. Consequently, we hold that Ms. Miller has standing to pursue her claim.

### B. Constitutionality of Section 1409

■ Ms. Miller challenges section 1409(a) on the ground that it violates the Equal Protection Clause of the Fourteenth Amendment, as applied to the federal government through the Fifth Amendment's Due Process Clause. *See Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

Specifically, Ms. Miller claims that the statute denies equal protection by illegally distinguishing between: (a) legitimate versus illegitimate children, (b) the illegitimate children of men versus those of women, and (c) the rights of the father of an illegitimate child versus those of its mother. Ms. Miller's last claim is based upon Mr. Miller's rights as a parent. Because he is not a party to this appeal, however, the claim is not properly before the court. *See Ablang v. Reno,* 52 F.3d 801, 804 n. 4 (9th Cir.1995) (holding that non-parties' claims could not be asserted by proxy through parties).

■ Before addressing the substance of Ms. Miller's claims, we must first determine the level of scrutiny we apply to the statute. The Supreme Court has recognized that "the power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. Mezei,* 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953). Acknowledging Congress's plenary authority to prescribe rules for the admission and exclusion of aliens, the Supreme Court has found it

> important to underscore the limited scope of judicial inquiry into immigration legislation. Th[e] Court has repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.

*Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) (internal quotation marks and citations omitted). In *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), the Court articulated a standard of review for First Amendment challenges in the immigration context. It held that the exercise of such power will be upheld if based on a "facially legitimate and bona fide reason." *Id.* at 770, 92 S.Ct. at 2585. Five years later, when faced with an equal protection challenge to an immigration statute's " 'double-barreled' discrimination based on sex and illegitimacy," *Fiallo,* 430 U.S. at 794, 97 S.Ct. at 1479, the Court found "no reason to review the broad Congressional policy choice at issue ... under a more exacting standard than was applied in *Klein-*

*dienst. ...." Id.* at 795, 97 S.Ct. at 1479. In determining whether a facially legitimate and bona fide reason supports a statute, we note that "Congress need not have stated its rationale for the distinction in the text or legislative history." *Ablang,* 52 F.3d at 805.

We now determine whether there is a facially legitimate and bona fide reason for the statute at issue here. Under the Immigration and Nationality Act, the burdens imposed upon illegitimate children are greater than those imposed upon legitimate children; and the burdens imposed upon the illegitimate children of American men are greater than those imposed upon the illegitimate children of American women. Specifically, under section 1401(g), *every legitimate* child born outside the United States "of parents one of whom is an alien, and the other a citizen of the United States" who meets certain residency requirements, is a citizen of the United States at birth. 8 U.S.C. § 1401(g). The provisions of that section, however, do not apply to the illegitimate child born abroad of a United States citizen and an alien who fails to meet the requirements set forth in section 1409. Similarly, while an illegitimate child born outside the United States of an American mother need only establish that the mother was a citizen at the time of its birth and has met a minimal residency requirement, *see id.* § 1409(c), the illegitimate child of an American father must establish two additional facts: it must prove both a *biological* relationship with the father, *see id.* § 1409(a)(1), *and* the existence, prior to the child's eighteenth birthday, of a *personal* relationship between them as evidenced by (a) the father's written agreement to provide it with financial support until it reaches that age and (b) the father's voluntary acknowledgement of his paternity or a court adjudication confirming the fact, *see id.* §§ 1409(a)(3) & (4).

As a practical matter, there is no distinction between the rights under the Act of the legitimate and illegitimate children of American women born outside the United States and its possessions. In each instance, only the fact of the mother's U.S. citizenship at the time of the child's birth need be established. Therefore, the issue before us is whether the additional requirements imposed by section 1409(a) on the illegitimate child of an American father represent an unconstitutional denial of equal protection based on (a) the status of the child and (b) the sex of the parent. We find the Supreme Court's decision in *Fiallo* to be dispositive on both counts.

That case involved a constitutional challenge to another section of the Act, 8 U.S.C. § 1101(b), which, like section 1409, draws distinctions among alien children on the basis of legitimacy and the sex of their parents. In relevant part, the section reads as follows:

> The term "child" means an unmarried person under twenty-one years of age who is—
>
> (A) a legitimate child; [or]
>
> \*   \*   \*   \*   \*   \*
>
> (D) an illegitimate child ... on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother or to its natural father *if the father has or had a bona fide parent-child relationship with the person....*

8 U.S.C. §§ 1101(b)(1)(A) & (D) (emphasis added). Section 1101(b) also includes a legitimated child within the definition but only if "such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of legitimation," *id.* § 1101(b)(1)(C)—conditions that are comparable to those imposed by sections 1409(a)(3) and (4). As in this case, the appellants in *Fiallo* claimed that the statute "denied them equal protection by discriminating against natural fathers and their illegitimate children 'on the basis of the father's marital status, the illegitimacy of the child, and the sex of the parent without either compelling or rational justification.'" 430 U.S. at 791, 97 S.Ct. at 1477 (citation omitted).

The Court observed that in enacting section 1101(b),

> Congress was specifically concerned with the relationship between a child born out of wedlock and his or her natural mother, and the legislative history ... reflects an

intentional choice not to provide preferential immigration status by virtue of the relationship between an illegitimate child and his or her natural father.

*Id.* at· 797, 97 S.Ct. at 1480. The Court acknowledged that the provisions of the section "ma[de] it more difficult for illegitimate children and their natural fathers to be reunited in this country than ... for illegitimate children and their natural mothers." *Id.* at 798, 97 S.Ct. at 1481. It pointed out, however, that while these were

> admittedly the consequences of the congressional decision not to accord preferential status to this particular class of aliens, ... the decision nonetheless remain[ed] one solely for the responsibility of the Congress and wholly outside the power of this Court to control. Congress obviously ha[d] determined that preferential status [was] not warranted for illegitimate children and their natural fathers, perhaps because of a perceived absence in most cases of close family ties as well as a concern with the serious problems of proof that usually lurk[ed] in paternity determinations. In any event, it [was] not the judicial role in cases of this sort to probe and test the justifications for the legislative decision.

*Id.* at 798–99, 97 S.Ct. at 1481–82 (internal quotation marks, citations, and footnotes omitted). The Court then held that the challenged provisions "are not unconstitutional by virtue of the exclusion of the relationship between an illegitimate child and his natural father from the preferences accorded by the Act" to others. *Id.* at 800, 97 S.Ct. at 1482.

While recent developments in DNA technology may have removed many of the difficulties that once plagued the proof of paternity, as required by section 1409(a)(1), in light of that holding and the Court's reference to "the perceived absence of close family ties" between illegitimate children and their natural fathers as well as to the problems of proof in paternity determinations, we see no basis for concluding that section 1409(a) is unconstitutional. Rather, we conclude, as did the Ninth Circuit, that "a desire to promote early ties to this country and to those relatives who are citizens of this coun-

try is not a[n ir]rational basis for the requirements made by" sections 1409(a)(3) and (4). *Ablang,* 52 F.3d at 806. Furthermore, we find it entirely reasonable for Congress to require special evidence of such ties between an illegitimate child and its father. A mother is far less likely to ignore the child she has carried in her womb than is the natural father, who may not even be aware of its existence. As the Court has recognized, "mothers and fathers of illegitimate children are not similarly situated." *Parham v. Hughes,* 441 U.S. 347, 355, 99 S.Ct. 1742, 1747, 60 L.Ed.2d 269 (1979). "The putative father often goes his way unconscious of the birth of the child. Even if conscious, he is very often totally unconcerned because of the absence of any ties to the mother." *Id.* at 355 n. 7, 99 S.Ct. at 1748 n. 7 (internal quotation marks and citation omitted). This sex-based distinction seems especially warranted where, as here, the applicant for citizenship was fathered by a U.S. serviceman while serving a tour of duty overseas. Counsel for Ms. Miller conceded, during oral argument, that Ms. Miller and her father had not had an ongoing parental relationship while she was a minor, although the two appear to have developed one since then. But even if Ms. Miller had argued, as did the appellants in *Fiallo,* that the requirements of section 1409(a) were "based on an overbroad and outdated stereotype concerning the relationship of unwed fathers and their illegitimate children," *Fiallo,* 430 U.S. at 799 n. 9, 97 S.Ct. at 1482 n. 9, the Supreme Court specifically noted that "this argument should be addressed to the Congress rather than the courts." *Id.*

### C. Application of Section 1409(a)

Ms. Miller contends that, even assuming the constitutionality of section 1409(a), the Texas state court's paternity decree applies retroactively to her birth, and that she therefore satisfies the requirement of section 1409(a). We are unpersuaded. Ms. Miller obtained the paternity decree after she turned 21; the statute, however, requires legitimation or establishment of paternity "*while* the person is under the age of" 18 or, as in her case, 21, depending on whether the previous or amended version of the statute

applies. To allow Ms. Miller to gain the retroactive benefit of a state court judgment would undercut Congress's clearly stated requirements and would have the effect of establishing citizenship in ways inconsistent with federal legislation. Because an applicant must satisfy each of the requirements of section 1409(a)(1)-(4), and Ms. Miller has failed to satisfy those of subsections (a)(3) and (4), the State Department properly denied her application for citizenship.

## III. CONCLUSION

While the district court erred in holding that Ms. Miller lacked standing to bring her claim, we reject her constitutional challenges to section 1409(a) and find that she failed to meet its requirements. We therefore remand the case to the district court for further proceedings consistent with this opinion. *So ordered.*

WALD, Circuit Judge, concurring in the judgment:

Charlie R. Miller obtained an order from a state court in Smith County, Texas on July 27, 1992, establishing paternity of his daughter, Lorelyn. If he had obtained the decree on June 19, 1991, the day before Lorelyn's 21st birthday, she would now be a citizen of the United States. But because of his delay of little more than a year and a month, she is not a citizen—though there is *no* question

that Miller is her father.[1] Unlike the majority, I see no rational basis for a law that requires a U.S. citizen father, but not a U.S. citizen mother, to formally legitimate a child before she reaches majority as well as agree in writing to provide financial support until that date or forever forfeit the right to transmit citizenship. Rather, I believe that this requirement is based simply on the stereotyping assumption that a mother will be closer to her child born out of wedlock than a father will be to his. Unfortunately, however, I also believe that the Supreme Court's decision in *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), forecloses us from holding that the imposition of such requirements on U.S. citizen fathers but not on U.S. citizen mothers is unconstitutional, and thus I regretfully concur in the judgment against Ms. Miller.

As the majority notes, under *Fiallo* we must uphold the requirement that a U.S. citizen father must legitimize and agree to provide financial support for his child before the age of majority to transmit citizenship, even though no parallel burden is placed on U.S. citizen mothers, if we find that there is a "facially legitimate and bona fide reason" to distinguish between U.S. citizens in this fashion. *Id.* at 795, 97 S.Ct. at 1479; *Kleindienst v. Mandel,* 408 U.S. 753, 770, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972).[2] The majority

---

1. As the majority notes, Lorelyn Miller fell into a narrow statutory age bracket the members of which were allowed to elect to have the version of 8 U.S.C. § 1409(a) that was in force at the time of the 1986 amendments apply to their citizenship applications. *See* 8 U.S.C. § 1409 *note* (Effective Date of 1986 Amendment). This version of section 1409(a) provided that a child born out of wedlock to a U.S. citizen father was a U.S. citizen at birth if the father met certain residency requirements and "the paternity of such child is established while such child is under the age of twenty-one years by legitimation." *See* 8 U.S.C. § 1409(a) *note* (Amendments). The government does not appear to dispute the fact that Charlie Miller met the relevant residency requirements and thus, under the version of section 1409(a) applicable to her, Lorelyn Miller was only required to have established her paternity by legitimation the age of twenty-one in order to qualify for citizenship. Since the government also does not dispute that the Texas state court order constituted legitimation under the terms of this version of section 1409(a), I

assume that this order would be sufficient to support Lorelyn Miller's claim for citizenship had she obtained it before she turned 21. I have couched the following discussion, however, in terms of the requirements contained in the current version of section 1409(a), which, as the majority describes, require the illegitimate child of a U.S. citizen father to "prove both a *biological* relationship with the father, *and* the existence, prior to the child's eighteenth birthday, of a *personal* relationship between them, as evidenced by (a) the father's written agreement to provide it with financial support until it reaches that age and (b) the father's voluntary acknowledgment of his paternity or a court adjudication confirming the fact." Majority opinion ("Maj. op.") at 1471.

2. Although my main complaint here is with *Fiallo's* acceptance of stereotypes as a basis for distinguishing between the sexes, I pause to note that *Fiallo's* application of the "facially legitimate and bona fide reason" standard to all immigration legislation, no matter how directly or

offers two rationales for the different treatment afforded men and women under the statute, both drawn from *Fiallo*. The first is that this approach will reduce fraudulent claims because there will generally be more reliable proof of maternity than paternity. The second is that distinguishing between the mothers and fathers of illegitimate children reflects the " 'perceived absence of close family ties' between illegitimate children and their natural fathers." Maj. op. at 1472 (quoting *Fiallo*, 430 U.S. at 799, 97 S.Ct. at 1481). In the majority's language, " 'a desire to promote early ties to this country and to those relatives who are citizens of this country is not a[n ir]rational basis for the requirements made by' sections 1409(a)(3) and (4)." Maj. op. at 1472 (quoting *Ablang v. Reno*, 52 F.3d 801, 806 (9th Cir.1995)).

There is nothing inherently illegitimate about either of these two goals. I am on common ground with the majority in believing that the government has a *bona fide* interest in ensuring that the children on which it confers citizenship are in fact the children of U.S. citizen parents. I also agree that requiring some sort of minimal "family ties" between parent and child, as well as fostering an early connection between child and country, is rational government policy. But these goals, however worthy, do not justify the imposition of a set of procedural hurdles on men—and only men—who wish to confer citizenship on their children.

Clearly the United States should not be in the business of conferring citizenship on people whose parentage is uncertain. *See Gomez v. Perez*, 409 U.S. 535, 538, 93 S.Ct. 872, 875, 35 L.Ed.2d 56 (1973) (discussing "lurking problems with respect to proof of paternity"). But this problem, as the majority

appears to concede, is satisfactorily addressed by the requirement of "clear and convincing evidence" of the father's paternity before a child can be declared a U.S. citizen. 8 U.S.C. § 1409(a)(1). Once parentage has been definitively established, there is no reason to require fathers, but not mothers, to take the additional step of formal legitimation and a written agreement to provide financial support before a child's 18th birthday. Before the advent of reliable genetic testing, this requirement of legitimation may well have been a reasonable method for preventing fraud, as false fathers would be more likely to claim paternity once a child had reached majority and no financial responsibility to the child remained. In the absence of "clear and convincing" evidence of the blood tie, such as genetic testing, this legitimation requirement might well have been a useful proxy.

But Congress itself has acknowledged that genetic testing is extremely reliable. In the Child Support Enforcement Amendments of 1984, Congress required states, as a condition of receiving federal funds, to eliminate laws establishing statutes of limitation on proof of paternity:

> Relatively short statutes of limitation were enacted in the past in order to prevent stale claims and to protect a man from having to defend himself against a paternity action brought years after the child's birth when witnesses may have disappeared and memories may have become faulty. Recent progress in developing highly specific tests for genetic markers now permits the exclusion of over 99 percent of those wrongly accused of paternity regardless of the age of the child. *These*

---

severely that legislation interferes with fundamental rights of U.S. citizens, is also outdated. This standard may have been appropriate when the Court was moving from its longstanding refusal to subject immigration legislation to any scrutiny whatever to the position that immigration legislation is not immune from review. But this transition having been accomplished, it would seem more in keeping with current Supreme Court doctrine to use a standard that grants great weight to Congress' power over immigration yet also takes into account the degree to which a particular immigration law restricts the constitutional rights of U.S. citizens and the

importance of the rights affected. *Cf. 44 Liquormart Inc. v. Rhode Island*, —— U.S. ——, ——, 116 S.Ct. 1495, 1507, 134 L.Ed.2d 711 (1996) (an absolute ban on the dissemination of truthful, nonmisleading commercial speech is subject to more rigorous review than a regulation that targets deceptive sales practices or leaves open alternative means of communication); *Planned Parenthood v. Casey*, 505 U.S. 833, 874, 112 S.Ct. 2791, 2819, 120 L.Ed.2d 674 (1992) (abortion restrictions should be judged by an undue burden standard that takes account of the degree to which a woman's right to terminate her pregnancy is infringed).

*advances in scientific paternity testing eliminate the rationale for placing arbitrary time limitations on the establishment of paternity for a child* and therefore the obligation to support that child. H. REP. No. 527, 98th Cong., 1st Sess. 38 (1983) (emphasis added). Since Congress itself has acknowledged that the accuracy of genetic testing has "eliminate[d] the rationale" for time limits on the establishment of paternity, the fear of fraud cannot be a facially legitimate and *bona fide* reason for requiring fathers—and only fathers—to take special actions to legitimate and agree to support their child by a certain date.

As a result, the majority places greater weight on the argument that requiring U.S. citizen fathers, but not U.S. citizen mothers, to legitimize and agree to give financial support to their children before they turn 18 fosters close and early ties between illegitimate children, the United States, and the relatives of the children. According to the majority, it is "entirely reasonable for Congress to require special evidence of such ties between an illegitimate child and its father. A mother is far less likely to ignore the child she has carried in her womb than is the natural father." Maj. op. at 1472. The majority seems to believe that there automatically will be closer and earlier "family ties" between a mother and her illegitimate child than between a father and his illegitimate child. I agree with the majority that traditionally mothers more frequently have assumed primary responsibility for illegitimate children, although it is a subject of some debate whether this phenomenon is traceable as much to socialization and sexism as to biological necessity. But there is a world of difference between noting that men and women often fill different roles in society and using these different roles as the justification for imposing inflexible legal restrictions on one sex and not the other. To do the latter is to govern on the basis of stereotyping

assumptions, an approach that has been repeatedly criticized by the Supreme Court. *See, e.g., Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 725, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) ("Care must be taken in ascertaining whether the statutory objective itself reflects archaic and stereotypic notions"); *Duren v. Missouri,* 439 U.S. 357, 369, 99 S.Ct. 664, 671, 58 L.Ed.2d 579 (1979) (state's practice of excluding women from jury venire violated equal protection where it was justified only by stereotype of "safeguarding the important role played by women in home and family life"). As the Supreme Court said in *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, ——, 114 S.Ct. 1419, 1422, 128 L.Ed.2d 89 (1994):

> Today we reaffirm what, by now, should be axiomatic: Intentional discrimination on the basis of gender by state actors violates the Equal Protection Clause, particularly where, as here, the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women.

Just last term, in reviewing the exclusion of women from the Virginia Military Institute, the Court reiterated that any governmental justification for official action that distinguishes between men and women "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *United States v. Virginia,* —— U.S. ——, ——, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735 (1996). While it is true that these cases represent instances where legislation was reviewed under heightened scrutiny, the tenor of the Court's castigation of gender stereotypes makes it highly doubtful that such stereotypes can ever serve as justifications for governmental action restricting the rights of citizens.[3]

Of particular significance to this case, the Court has been unwilling to countenance the use of stereotypes to justify lasting distinc-

---

**3.** In a recent speech, then-Solicitor General Drew S. Days explained that the United States did not seek certiorari in *Wauchope,* a Ninth Circuit case holding that the pre–1934 rule granting citizenship to the foreign-born children of U.S. citizen fathers but not to the foreign-born children of U.S. citizen mothers was unconstitutional, because it was convinced that the Ninth

Circuit's decision was "consistent with modern developments in the Supreme Court's jurisprudence concerning statutory distinctions based on gender." Drew S. Days, Lecture, *The Solicitor General and the American Legal Ideal,* 49 SMU L.REV. 73, 81 (1995); *Wauchope v. United States Dep't of State,* 985 F.2d 1407, 1416 (9th Cir. 1993).

tions between the mothers and fathers of illegitimate children. In *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), the Court struck down a New York statute that required the consent of a mother and not of a father for the adoption of an illegitimate child, arguing that stereotypes regarding the relationships mothers and fathers will have with their illegitimate children are only acceptable, if at all, in the child's infancy: "Even if unwed mothers as a class were closer to their newborn infants, this generalization concerning parent-child relations would become less acceptable as a basis for legislative distinctions as the age of the child increased." *Id.* at 389, 99 S.Ct. at 1766. Subsequent case law has established that as the child gets older the extent of the mother's or father's relationship with the child becomes the only relevant basis on which to distinguish between them: "If one *parent* has an established custodial relationship with the child and the other *parent* has either abandoned or never established a relationship, the Equal Protection Clause does not prevent a state from according the two *parents* different legal rights." *Lehr v. Robertson,* 463 U.S. 248, 267–68, 103 S.Ct. 2985, 2996–97, 77 L.Ed.2d 614 (1983).[4] Needless to say, here we have a statute that distinguishes between fathers and mothers of illegitimate children a substantial period—18 years—after birth, and does so in addition to requiring clear and convincing evidence of paternity. We also have a statute that accords different treatment to U.S. citizen mothers who fail to establish relationships with their illegitimate children until after they turn 18 than to U.S. citizen fathers in the same situation; the mothers can transmit their citizenship to their children despite the lack of an early relationship, whereas the fathers cannot.

As a general rule, of course, Congress is free to promote close family ties by ensuring that citizenship is conferred only on children who have at least minimal contact with citizen parents during their early and formative years. Thus, even though the line is arbitrary, I see no problem with a requirement that the U.S. citizen parent take some action to acknowledge parentage or responsibility for a child before the child reaches age 18. But this putative interest provides absolutely no basis for requiring fathers, and only fathers, to formally declare parentage and agree to provide financial support before a child reaches age 18. Such a distinction clearly derives from the stereotyping assumption that mothers automatically will be close to their illegitimate children whereas fathers will not, and under current jurisprudence such an assumption should not be considered a facially legitimate or *bona fide* reason for government action. In *Fiallo,* however, the Court held that the exact same assumption that fathers will not be close to their illegitimate children *was* a facially legitimate and *bona fide* reason for distinguishing between the mothers and fathers of illegitimate children in immigration legislation. *Fiallo,* 430 U.S. at 799, 97 S.Ct. at 1481–82. Notably, and regrettably, *Fiallo* treated the fear of legislating on the basis of stereotypes

4. The majority cites *Parham v. Hughes,* 441 U.S. 347, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979), for the proposition that the "mothers and fathers of illegitimate children are not similarly situated." *Id.* at 355, 99 S.Ct. at 1747. *Parham* was a plurality opinion upholding a Georgia law that allowed only mothers of illegitimate children and fathers who had legitimated their children to sue for the wrongful death of the child. The crucial link in the Court's reasoning was the fact that Georgia provided that *only* the father could legitimize a child; the Court argued that the requirement that a father can only bring a wrongful death action if he has legitimated his child "does not reflect any overbroad generalizations about men as a class, but rather the reality that in Georgia only a father can by unilateral action legitimate an illegitimate child." *Id.* at 356, 99 S.Ct. at 1748. In other words, the Court explicit-

ly based its finding that the mothers and fathers of illegitimate children are not similarly situated on the fact that under Georgia law only a father can legitimate an illegitimate child. *Id.* at 355–56, 99 S.Ct. at 1747–48. Of course, the real question then becomes whether a statute that allows fathers but not mothers to legitimate their illegitimate children is unacceptably based on stereotypes, but the Court refused to consider the constitutionality of the legitimization restriction on the grounds that a challenge to its constitutionality was not before the court. *Parham,* 441 U.S. at 355, 99 S.Ct. at 1747. Here, however, there is no underlying additional statute that excuses or explains the distinctions drawn between the U.S. citizen mothers and fathers of illegitimate children, and thus *Parham's* holding appears irrelevant.

with a somewhat cavalier disdain, remarking in a footnote that any complaints that statutory distinctions between the illegitimate children of mothers and fathers and their illegitimate children are "based on an overbroad and outdated stereotype concerning the relationship of unwed fathers and their illegitimate children" were more appropriately addressed to Congress. *Id.* at 799 n. 9, 97 S.Ct. at 1482 n. 9.

*Fiallo* is a Supreme Court decision directly on point and, as a result, we have no choice but to hold section 1409(a) constitutional. Yet I think it is important to underscore the extent to which *Fiallo* is out of step with the Court's current refusal to sanction "official action that closes a door or denies opportunity to women (or to men)" based on stereotypes or "overbroad generalizations" about men and women. *Virginia*, —— U.S. at ——, 116 S.Ct. at 2275. *Fiallo* is a precedent whose time has come and gone; it should be changed by Congress or the Supreme Court.