**REVISED NOVEMBER 15, 2013**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

September 11, 2013

No. 12-60087

Lyle W. Cayce
Clerk

SIGIFREDO SALDANA IRACHETA,

Petitioner

v.

ERIC H. HOLDER, JR., U. S. ATTORNEY GENERAL,

Respondent

Petition for Review of an Order
of the Department of Homeland Security

Before REAVLEY, ELROD, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

This appeal is a petition for review from the Department of Homeland Security's ("DHS") reinstatement of a previously-issued order of removal against Sigifredo Saldana Iracheta ("Saldana"). On appeal, Saldana asserts that he acquired citizenship from his U.S. citizen father at birth. We hold that under the applicable immigration laws, Saldana has established that he is a U.S. citizen.

No. 12-60087

## I. Factual and Procedural Background

Saldana was born in 1964 in Matamoros, a city in the Mexican state of Tamaulipas. It is undisputed that his father, Sigifredo Saldana, is a U.S. citizen. Saldana's mother, Amelia Iracheta, is a citizen of Mexico. Saldana's out-of-wedlock birth was registered by both his mother and father when they put their names on his birth certificate before the Civil Registry in Mexico when he was 29 months old. The parties debate the legal significance of this fact. Though they never married, Saldana's mother and father had eight children together, including Saldana. DHS has repeatedly denied Saldana's applications for a certificate of citizenship. Several of Saldana's siblings have been granted certificates of citizenship, some under different laws applicable to different siblings because of the years of their birth. One sister, Ana, who is older than Saldana and subject to the same laws, has also been granted a certificate of citizenship.[1]

We briefly describe Saldana's immigration and criminal history. Saldana was granted temporary status as an agricultural worker in 1989. In January 1989, Saldana was convicted in Texas state court of delivery of a controlled substance and sentenced to 40 years in prison. He served four years before being released to the custody of the Immigration and Naturalization Service. Saldana was issued an order to show cause, alleging that he was a native and citizen of Mexico and that he entered the United States illegally. Although he initially claimed to be a U.S. citizen, Saldana conceded alienage when he could not locate documents to support his citizenship claim. A removal order was issued, and Saldana was deported to Mexico in 1992. Saldana was again located in the United States and removed in 1995 and 1999. In April 2002, Saldana was

---

[1] DHS now asserts that Ana's certificate of citizenship was erroneously issued and that DHS has begun proceedings to revoke it, six years after it was granted.

No. 12-60087

charged with illegal reentry. This case was dismissed to allow Saldana to file an N-600 application for a certificate of citizenship. Saldana asserts that he previously was not aware that he could acquire U.S. citizenship from his father. In December 2002, Saldana filed his first N-600 application, claiming that he acquired citizenship from his father at birth. His application was denied, partly on the basis that he had not established that his father resided in the U.S. for the requisite length of time, a fact the government now concedes. Saldana subsequently filed additional N-600 applications in August 2003, April 2005, and January 2007, all of which were denied or dismissed by DHS on various grounds, some of which are discussed below.

In January 17, 2012, Saldana was arrested for a traffic violation. He was issued a Notice of Intent/Decision to Reinstate Prior Order. In DHS detention, Saldana stated that he was a U.S. citizen. On January 31, 2012, DHS determined that Saldana did not make a probative claim to U.S. citizenship, and Saldana's 1999 order of removal was reinstated. Saldana was then removed to Mexico. On February 6, 2012, Saldana filed a timely petition for review and petition for habeas corpus with this court.

## II. Discussion

### A.    Jurisdiction

Though the parties agree that we have jurisdiction, we must first satisfy ourselves of our own jurisdiction. *See, e.g., Ojeda-Terrazas v. Ashcroft*, 290 F.3d 292, 294 (5th Cir. 2002). This case arises from DHS's January 17, 2012 reinstatement of the 1999 removal order against Saldana. We treat this appeal as a petition for review of that order of reinstatement. *See* 8 U.S.C. § 1252(a)(5) (providing that a petition for review with the court of appeal is the "sole and exclusive means for judicial review of an order of removal"). We clearly have jurisdiction over a petition for review of a reinstatement order. *Ojeda-Terrazas*, 290 F.3d at 295 (holding that court of appeals' statutory jurisdiction over "final

3

orders of removal" extends to reinstatement orders). Under the applicable regulations, reinstatement is ordered after a DHS officer determines: (1) the identity of the alien; (2) that the alien was subject to a prior order of removal; and (3) that the alien unlawfully reentered the United States. *Id.* at 296; 8 C.F.R. § 241.8(a); 8 U.S.C. § 1231(a)(5). *Ojeda-Terrazas* provides that this court's review is normally limited "to the reinstatement order itself; this court cannot 'reopen or review' the merits" of the underlying removal order. 290 F.3d at 295. However, we also have jurisdiction to review Saldana's nationality claim in the context of a reinstatement order. *See* 8 U.S.C. § 1252(b)(5). We have previously recognized that "in the context of an order of removal, the INA explicitly places the determination of nationality claims in the hands of the courts." *Lopez v. Holder*, 563 F.3d 107, 110 (5th Cir. 2009) (alterations omitted) (quoting *Alwan v. Ashcroft*, 388 F.3d 507, 510 (5th Cir. 2004)). "Specifically, § 1252(b)(5) provides that if the petitioner claims to be a national of the United States and the court of appeals finds that the pleadings and affidavits present no genuine issue of material fact regarding nationality, the court of appeals 'shall decide the nationality claim.'" *Id.* (quoting § 1252(b)(5)(A)). If the case does present a genuine issue of material fact, "the court of appeals shall transfer the case to the district court for the district where the petitioner resides" for a hearing on the claim. *Id.*; § 1252(b)(5)(B). Under these provisions, "a court of appeals is directed to conduct a de novo determination, based on the record, of an alien's claim of nationality." *Lopez*, 563 F.3d at 100 (citing *Marquez-Marquez v. Gonzales*, 455 F.3d 548, 554 (5th Cir. 2006)); *see also Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 393 (5th Cir. 2006) (noting that court of appeals is empowered to decide nationality claims by § 1252(b)(5)). The fact that immigration authorities have previously rejected Saldana's citizenship claim does not inhibit our review; pursuant to § 1252(b)(5) he is entitled to de novo review of that claim in this court. *See Lopez*, 563 F.3d at 110.

No. 12-60087

Further, if Saldana is a U.S. citizen, his reentry was not "unlawful" and reinstatement would not be lawful, as DHS presumably recognized when it considered and rejected Saldana's claim of citizenship before ordering reinstatement.    Similarly, whether Saldana is actually an alien is a jurisdictional fact in a removal or reinstatement proceeding.  Only "aliens" are subject to removal, *e.g., Omolo v. Gonzales*, 452 F.3d 404, 407 (5th Cir. 2006), and only "aliens" are subject to reinstatement of a removal order, *see* 8 U.S.C. § 1231(a)(5).  Thus, we have jurisdiction to consider whether Saldana is in fact an alien on this petition for review.  *See Omolo*, 452 F.3d at 407 (determining nationality claim in order to determine whether petitioner's appeal was jurisdictionally barred for failure to exhaust administrative remedies because only "aliens" must exhaust).

Satisfied of our jurisdiction over this petition for review, including Saldana's nationality claim, we now turn to the merits of his claim.

B.    *Saldana's Nationality Claim*

A nationality claim is a question of law that this court reviews de novo. *See Marquez-Marquez*, 455 F.3d at 554; *Lopez*, 563 F.3d at 110.  Much of the dispute on appeal consists of the correct meaning of the Mexican laws applicable to Saldana.  Just like any question of law, "[t]he content of foreign law is a question of law and is subject to de novo review." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 713 (5th Cir. 1999) (citing  Fed. R. Civ. P. 44.1; *Perez & Compania v. M/V Mexico I*, 826 F.2d 1449, 1450 (5th Cir. 1987)).

Saldana claims that he automatically acquired citizenship at birth from his U.S. citizen father.  The applicable law for transmitting citizenship to a child born abroad when one parent is a citizen is the statute in effect at the time of the child's birth. *See, e.g., Marquez-Marquez*, 455 F.3d at 559 n.23.  Saldana is a child born out of wedlock to a citizen father.  As such, to acquire U.S. citizenship under the applicable statutes in effect at the time of his birth in 1964, he must

show: (1) he was legitimated before the age of 21 under the laws of the Mexican state where he resided or was domiciled as a child, *see* 8 U.S.C. § 1409(a) (1964) (hereinafter INA § 309)[2]; 8 U.S.C. § 1101(c)(1) (1952); and (2) before his birth, his father had ten years of physical presence in the U.S., at least five of which were after the age of 14, *see* 8 U.S.C. § 1401(a)(7) (1964) (hereinafter INA § 301). Saldana was born and resided in the Mexican state of Tamaulipas, and it is the laws of that state which govern his claim of legitimation. At oral argument, the government conceded that Saldana has shown that his father had the required length of physical presence in the U.S. Thus, we confront only the question of whether Saldana's paternity was established by legitimation as required by INA § 309.

Although we owe no deference to the agency's interpretation of foreign law, *see, e.g., Bustamante-Barrera*, 447 F.3d at 393 (noting that deference only applies if Congress has delegated authority to the agency to clarify statutory ambiguity), we first note that, prior to this appeal, no decisionmaker has clearly applied the correct Mexican statutes to Saldana's claim of citizenship. In both Saldana's case and other cases involving similar situations, DHS officers and the Administrative Appeals Office ("AAO") within DHS have relied on provisions of the Mexican Constitution that either never existed or do not say what DHS claims they say. In Saldana's case and in others, DHS has relied on the proposition that Article 314 of the Constitution of Mexico provides that children born out of wedlock may be legitimated solely by the subsequent marriage of their parents. *See Matter of Reyes*, 16 I. & N. Dec. 436 (BIA 1978) (citing Article 314 of the Constitution of Mexico for this proposition); *In re: Applicant*, 2008 WL 3990518, at *2 (AAO March 18, 2008) (relying on Article 314 and *Reyes* to deny

---

[2] The statutes also allow other avenues for legitimation, such as showing legitimation under the laws of his father's residence, but Saldana argues only that he was legitimated under the laws of Mexico.

No. 12-60087

a citizenship claim); *In re: Applicant*, 2007 WL 5360778, at \*2 (AAO November 27, 2007) (same); *In re: Applicant*, 2007 WL 5337094, at \*2 (AAO July 2, 2007) (same).  At oral argument, however, the government conceded that Article 314 of the Constitution of Mexico does not exist and never did.[3]  In its May 2004 rejection of Saldana's claim of citizenship, the AAO also cited Article 130 of the Constitution of Mexico for the same proposition that the Constitution requires that parents be married in order for children to be legitimated.  However, Article 130 provides only that marriage is a civil contract, as opposed to a religious one, and says nothing about legitimation or children.  In denying Saldana's citizenship claim in the 2012 reinstatement decision, DHS relied on a patchwork of BIA and AAO cases, including *Reyes* (which relied on the non-existent Article 314), and other cases concerning the validity of marriages in Mexico.  The cases seem to contradict each other. *Compare Matter of Hernandez*, 14 I. & N. Dec. 608 (BIA 1973) (denying citizenship because the "common law" marriage of his parents made the petitioner legitimate), *with Matter of Rodriguez-Cruz*, 18 I. & N. Dec. 72 (BIA 1981) (denying citizenship because the "religious marriage" of his parents was invalid and made the petitioner illegitimate).  In short, the reasoned decisionmaking that we expect from administrative agencies has been lacking at various points in Saldana's case.  In any event, the parties seem to now implicitly agree that the Constitution of Mexico says nothing about the

---

[3] It is unclear whether the government has previously acknowledged this error, which originated at the BIA in 1978, over three decades ago. *See Reyes*, 16 I. & N. Dec. at 436. However, DHS relied on *Reyes* as recently as January 2012 and relied explicitly on Article 314 as recently as 2008, in rejecting Saldana's citizenship claims.  Though the government attempted to dismiss this error as a mere "typo," we cannot agree.  It is unclear what legal authority the BIA actually relied on in *Reyes*.  It may have been a provision of the applicable civil code, as opposed to the Constitution of Mexico.  The substance of the law may or may not have been correct in *Reyes,* but the BIA's mistake in citing a non-existent constitutional provision, perpetuated and uncorrected by DHS in subsequent years, prevented the agency from making the correct inquiries or possibly from applying the correct law in subsequent cases.  That error has wound its way through multiple agency decisions in immigration matters, which are significant to the impacted individuals.

legitimation of children, and do agree that the applicable law is the Civil Code of Tamaulipas.

On appeal, the government presents an August 2012 Library of Congress report clarifying the legitimation laws of Tamaulipas, Mexico. *See* The Law Library of Congress, Report for the Department of Justice: Tamaulipas, Mexico, Legitimation of a Child, L.L. File No. 2012-008314 (2012) (hereinafter "2012 LOC Report"). Saldana additionally cites a 2004 report from the Library of Congress on the parentage, filiation, and paternity laws of the Mexican states, including Tamaulipas. *See* The Law Library of Congress, Tamaulipas, Mexico: Parentage, Filiation and Paternity Laws, L.L. File No. 2004-416 (2004) (hereinafter "2004 LOC Report"). We have reviewed these materials and have considered the arguments of the parties regarding their meaning.

We now hold that Saldana acquired full filial rights vis-a-vis his father under the laws of Tamaulipas, and thus his paternity was established by legitimation under INA § 309.

"Legitimacy is a legal concept. The law makes a child legitimate or illegitimate." *Lau v. Kiley*, 563 F.2d 543, 548 (2d Cir. 1977). The Second Circuit has persuasively explained:

> There must be some purpose in the distinction the law makes between legitimate children and illegitimate children. The distinction must have some effect and must have been designed to distinguish between the two categories in order that they have different rights or obligations. Whether a child is born in wedlock or out of wedlock may be sociologically, religiously, or psychologically significant, but there is no legal significance unless the law makes one.

*Id.* Accordingly, "[f]or many years the BIA appears to have been of the view that the concept of legitimacy turned on the substantive legal rights conferred by applicable law rather than on mere labels codified by statute." *Watson v. Holder*, 643 F.3d 367, 369 (2d Cir. 2011). Specifically, the BIA has defined

"legitimation," as the term is used in the INA, as "the act of putting a child born out of wedlock in the same legal position as a child born in wedlock." *In re Cabrera*, 21 I. & N. Dec. 589, 591 (BIA 1996); *see also Lau*, 563 F.2d at 550. "Where less than equality of status results, an act of legitimation is not deemed to have occurred." *Cabrera*, 21 I. & N. Dec. at 591; *see also Peignand v. INS*, 440 F.2d 757, 759 (1st Cir. 1971) (holding that differences in matters of succession distinguished legitimation from acknowledgment in the statute at issue). Thus, Saldana's paternity is established by legitimation if the law of Tamaulipas placed him "in the same legal position as a child born in wedlock," regardless of the applicable legal label. *Cabrera*, 21 I. & N. Dec. at 591.

The 2012 LOC Report describes the legitimation and acknowledgment of children in Tamaulipas, including the historical changes to those laws. From 1961 to 1987, the Civil Code of Tamaulipas had separate chapters applicable to children born in and out of wedlock. 2012 LOC Report, at 3. With regard to children born out of wedlock, the Tamaulipas Code also had separate chapters for "legitimation" and "acknowledgment" of children. *Id.* at 3-4. Saldana was born in 1964 and is subject to the pre-1987 laws. In order for a child to be "legitimated" as the term is used in the Tamaulipas Code, the LOC Report states that the parents must subsequently marry each other. 2012 LOC Report, at 4. However, the LOC Report states that the Tamaulipas Code separately provided that children born out of wedlock could be "acknowledged" in a variety of ways, including "In the birth certificate, before the official of the Civil Registry." *Id.* at 5. Saldana was thus formally acknowledged by his father when his father placed his name on Saldana's birth certificate before the official registry. The 2012 LOC Report provides that "acknowledged" children, such as Saldana, had the rights: (1) to bear the surname of the parent who acknowledged him or her; (2) to be supported by that parent; and (3) to inherit from that parent. *Id.* at 6. The Tamaulipas Code was amended in 1987 to abolish all distinctions between

No. 12-60087

legitimate and illegitimate children, and provides various ways for parents to acknowledge children, whether the parents marry or not. *Id.* at 6-7; *see also* 2004 LOC Report.   The 2012 LOC Report provides that, post-amendment, all acknowledged children have the right to: (1) take the surname of the parents who acknowledge him or her; (2) receive support from those parents; and (3) to inherit from those parents. 2012 LOC Report, at 7.  These are the same rights that "acknowledged" children had prior to the abolishment of the distinction between legitimate and illegitimate children.   Thus, under the applicable civil code of Tamaulipas, "acknowledged" children such as Saldana had full filial rights, vis-a-vis the acknowledging parent, even before the distinction between legitimate and illegitimate children was abolished.   Given this, Saldana's paternity was established via legitimation under the laws of Tamaulipas because of his acknowledgment by his father, which gave him all the same rights as any child.

It is of no moment that the applicable Tamaulipas Code distinguishes between "legitimation" and "acknowledgment" in its text.  We, of course, apply the meaning of "legitimation" as used in INA § 309, which is concerned with the substantive rights granted rather than with semantic distinctions in the foreign law. Where jurisdictions use different legal labels for "legitimated" children and "acknowledged" children, those children who attain "complete equality of filial rights" with children born in wedlock are considered "legitimated" as the term is used in the INA.  *See Matter of Oduro,* 18 I. & N. Dec. 421, 422-423 (BIA 1983).  In *Matter of Mourillon*, the BIA did state that where the foreign law "specifically differentiates between acknowledgment and legitimation in the two statutory provisions it is reasonable to presume, absent an affirmative showing to the contrary, that the law does not create a distinction without a difference." 18 I & N. Dec. 122, 124 (BIA 1981); *see also Matter of Oduro*, 18 I. & N. Dec. at 424 n.4.    However, the textual distinction between "legitimation" and

10

"acknowledgment" in the Tamaulipas Code is not necessarily without a difference. *See Lau*, 563 F.2d at 550. The legitimation chapter of the Tamaulipas Code allows for a particular method of legitimation by both parents if they marry, whereas the acknowledgment chapter requires each parent to take specific action if the parents do not marry, and grants rights to the child vis-a-vis the acknowledging parent only. An acknowledged child, however, acquired full filial rights with regard to the acknowledging parent. This is the relevant question for the purpose of determining whether "acknowledgment" is substantively equivalent to "legitimation." As we have said, it is the substance that matters, not the legal label.

Further, there is no legal or logical basis for a holding that a mere textual distinction between "acknowledgment" and "legitimation" in the foreign law should be controlling, when the rights granted to the children are the same. *See Watson*, 643 F.3d at 370 & n.1. No immigration purpose is advanced through such a distinction. The Supreme Court has explained that the governmental interests which justify additional requirements for children born to citizen fathers out of wedlock are to ensure that a biological relationship exists, to ensure that the father and child have the opportunity to develop a lasting relationship and therefore foster ties between the U.S. and the child, and to prevent fraud. *See Tuan Anh Nguyen v. I.N.S.,* 533 U.S. 53, 62-65 (2001); *Miller v. Albright*, 523 U.S. 420, 438-40 (1998). There is no dispute about Saldana's biological parentage, no dispute that Saldana and his father maintained a lasting relationship, and Tamaulipas law still required a voluntary, affirmative act by the father before the child was considered acknowledged, whether by placing his name on the birth certificate or taking some other action, which must still occur while the child is a minor. Maintaining a distinction between "legitimated" children and "acknowledged" children, though the substantive rights are the same, is not only counter to the BIA's historical approach, but it

does nothing to advance the relationship between an acknowledged child and his parents or to prevent fraud.

In sum, under the laws of Tamaulipas, Mexico, where Saldana was born and resided as a child, he was acknowledged by his father when his father placed his name on the birth certificate before the Civil Registry. As an acknowledged child, Saldana had the same filial rights vis-a-vis his father as a "legitimated" child. Thus, his paternity was established by legitimation according to the laws of his domicile as required by INA § 309. Because we hold that Saldana's paternity was established by legitimation under the old Tamaulipas Code, we do not reach Saldana's alternative argument that the 1987 amendments to the Tamaulipas Code, which abolished the concept of illegitimacy, apply retroactively to him.

At oral argument, the government conceded that Saldana's father met the physical presence requirements of INA § 301. In support of his father's physical presence, Saldana produced his father's birth certificate showing that he was born in Texas in 1936, his father's social security records from 1953 to 1971, his father's selective service registration from 1954 showing residence in Brownsville, Texas, a notarized affidavit from his father describing his U.S. residency and employment history in multiple U.S. states, and a notarized affidavit from his mother also providing that Saldana's father always resided in the U.S. We agree with the parties that this evidence is sufficient to establish that Saldana's father had the requisite physical presence in the U.S. We therefore hold that Saldana meets the requirements of INA §§ 301 and 309 and acquired U.S. citizenship from his father at birth.

12

No. 12-60087

### III. Conclusion

For the reasons stated above, we GRANT Saldana's petition for review. We REMAND to the agency with instructions to vacate or terminate any orders or proceedings as necessary to effectuate this opinion.[4]

---

[4] There are several motions pending in this case. We DENY the government's motion to strike portions of the reply brief and GRANT the government's alternative motion to file a sur-reply brief; we also GRANT Saldana's motion to file an addendum to his reply brief. We have therefore fully considered all of the parties' legal arguments concerning the applicable Mexican law in rendering this decision. All other outstanding motions are DENIED.

13