# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-41413

United States Court of Appeals
Fifth Circuit

**FILED**

February 6, 2018

Lyle W. Cayce
Clerk

ERNESTO GONZALEZ-SEGURA,

Plaintiff–Appellant,

v.

JEFFERSON B. SESSIONS, III, U. S. ATTORNEY GENERAL,

Defendant–Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, SMITH, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Ernesto Gonzalez–Segura was born out of wedlock in Mexico in 1969. His father was a U.S. citizen, and his mother was a Mexican national. Gonzalez–Segura now seeks derivative U.S. citizenship. He believes two documents substantiate his claim: his birth certificate (which a Mexican court revised in 2007) and his father's 1970 holographic will. The district court concluded that he could not as a matter of law prove his derivative citizenship under former

No. 16-41413

Immigration and Nationality Act[1] §§ 301(a)(7),[2] 309(a).[3] We AFFIRM the district court's summary judgment against him.

## I. BACKGROUND

Gonzalez–Segura was born out of wedlock on June 13, 1969, in the Mexican state of Tamaulipas. His biological mother is Natalia Segura, a Mexican national. His biological father is Nicolas Gonzalez, a U.S. citizen. He has two siblings from the same parents.

In 1970, his father drafted a holographic will on the back of a 1963 land conveyance document. Translated from Spanish, the 1970 holographic will stated:

> I Nicolas Gonzalez am[] writing this letter to state that I am leaving this property for Natalia Segura and my sons Ernesto, Ruben, and Ernesto Gonzalez paid in full and no debt on this month of August 8, [1970].[4]

Nicolas's signature followed the note.

In 1972, his mother married Lorenzo Sandoval. That same year, the couple registered Gonzalez–Segura with the Civil Registry of Rio Bravo in Mexico, listing him as their son. The registration did not acknowledge Gonzalez–Segura's biological father, Nicolas.

Three years later, Nicolas died.

In 1990, Gonzalez–Segura obtained legal permanent residency in the United States. Five years later, he was excluded and deported under INA

---

[1] As explained below, the 1952 Immigration and Nationality Act as amended (hereinafter "INA") governs Gonzalez–Segura's claim. This opinion's discussion of the INA refers exclusively to the version of the Act in effect in 1969, the year of Gonzalez–Segura's birth. Our ruling does not govern the interpretation of subsequent versions of the INA.

Gonzalez–Segura suggests that the panel should consider how the INA as amended in 1986 applies to his claim. As explained below, the 1986 version of the Act was not in effect at the time of his birth, so it cannot govern his claim to derivative citizenship.

[2] Codified at 8 U.S.C. § 1401(a)(7) (1966) (hereinafter "INA § 301(a)(7)").

[3] Codified at 8 U.S.C. § 1409(a) (1952) (hereinafter "INA § 309(a)").

[4] The brackets note corrections to typographical errors in the expert's translation.

No. 16-41413

§§ 212(a)(2)(C), 212(a)(6)(B)(i), and 212(a)(7)(A)(i)(I). However, sometime later, he returned to the United States. In 2004, he was removed again after a drug offense conviction.

In 2007—when he was thirty-five years old—Gonzalez–Segura brought a lawsuit against his mother, Lorenzo Sandoval, and the Civil Registry of Rio Bravo. Gonzalez–Segura sought to have a Tamaulipas court amend his birth certificate to list Nicolas Gonzalez as his biological father. Gonzalez–Segura prevailed in the suit, and the court ordered that his birth certificate list Nicolas Gonzalez as his biological father.

In October 2013, Gonzalez–Segura filed an N-600 Application for Certificate of Citizenship with United States Citizenship and Immigration Services. He asserted in the application that Nicolas Gonzalez was his biological father, so he was entitled to claim derivative citizenship.

In October 2014, while in the custody of a Texas county's sheriff's office, United States Immigration and Customs Enforcement agents apprehended Gonzalez–Segura. He was subsequently indicted for criminal reentry in violation of 8 U.S.C. § 1326.[5] Soon after, his N-600 Application for Certificate of Citizenship was denied.

The following month, Gonzalez–Segura filed a petition before the Fifth Circuit to review his citizenship claim. The next month, he filed a motion to transfer the review to the U.S. District Court for the Southern District of Texas and filed a motion for stay of removal. In January 2015, our Court transferred his claim to the Southern District of Texas and granted his motion for stay of removal.

In February 2015, Gonzalez–Segura filed his suit in the Southern District of Texas. Over a year later, the district court ruled in favor of the

---

[5] The government eventually dismissed the indictment without prejudice.

No. 16-41413

Government on its motion for summary judgment. The court subsequently entered a final judgment dismissing Gonzalez–Segura's claims with prejudice. A few days later, Gonzalez–Segura timely filed a notice of appeal.

## II. JURISDICTION

The district court had jurisdiction to resolve whether Gonzalez–Segura raised "a genuine issue of material fact about [his] nationality." 8 U.S.C. § 1252(b)(5)(B). We have jurisdiction to review the final judgment of the district court under 28 U.S.C. § 1291.

## III. STANDARDS OF REVIEW

### A.     Reviewing Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is reviewed de novo, "applying the same standard as . . . the district court." *United States v. Lawrence*, 276 F.3d 193, 195 (5th Cir. 2001) (citations omitted). "Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the court establish that there are no genuine issues of material fact, and that the moving party is entitled to summary judgment as a matter of law." *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995) (citations omitted). The panel "must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment." *Id.* "However, the non-movant must go beyond the pleadings and present specific facts indicating a genuine issue for trial in order to avoid summary judgment." *Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014). The panel may affirm summary judgment on any ground the record supports. *Id.* (citation omitted).

4

**B.    Reviewing Foreign Law**

The district court's determination of foreign law "must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1. This determination "is subject to de novo review." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 713 (5th Cir. 1999) (citations omitted). "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. "[D]ifferences of opinion" regarding "the content, applicability, or interpretation of foreign law do not create a genuine issue as to any material fact under Rule 56." *Access Telecom*, 197 F.3d at 713 (citation omitted). Thus, summary judgment is generally "appropriate to determine the content of foreign law." *Id.* (citation omitted).

## IV. DISCUSSION

**A.    Legal Framework for Gonzalez–Segura's Citizenship Claim**

### *1. Overview*

This case involves a complicated web of overlapping foreign and domestic law. The statute governing Gonzalez–Segura's claim to derivative citizenship is the version of the INA in place at the time of his birth. Under that statute, Gonzalez–Segura must establish his paternity by legitimation in order to claim derivative citizenship. The INA also dictates that his claim to legitimation is governed by the laws of Tamaulipas, Mexico—where he resided as a child. Even if he can prove his legitimation under Tamaulipan law, the INA imposes an additional hurdle for claiming derivative citizenship: legitimation must have occurred *before* Gonzalez–Segura turned twenty-one years old. We conclude that Gonzalez–Segura cannot as a matter of law make this showing, so we affirm the district court's summary judgment against him.

## 2. Legal Framework

Gonzalez–Segura was born in Mexico, so "naturalization is his sole source for a claim of citizenship." *Bustamante–Barrera v. Gonzales*, 447 F.3d 388, 394 (5th Cir. 2006). The immigration statute in place at the time of his birth governs his citizenship claim. *Iracheta v. Holder*, 730 F.3d 419, 423 (5th Cir. 2013). Thus, the versions of INA §§ 301(a)(7), 309(a) that were in place in 1969 govern. Gonzalez–Segura bears the burden of proving that he qualifies for naturalization, and he must strictly comply with statutory requirements. *Bustamante–Barrera*, 447 F.3d at 394. We must "resolve all doubts 'in favor of the United States and against' those seeking citizenship." *Id.* at 394–95 (quoting *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967)).

The INA dictates that a child born out of wedlock to a non-citizen mother and a citizen father can establish derivative citizenship "if the paternity of such child is established while such child is under the age of twenty-one years by legitimation." INA § 309(a); *see Iracheta*, 730 F.3d at 423. Thus, there are two related requirements: what must happen (legitimation) and when (while the child is under twenty-one years old). Each issue bears on this appeal.

### a. Legitimation requirement

"Legitimation" is not defined in the INA. However, the Board of Immigration Appeals defines "legitimation" as "the act of putting a child born out of wedlock in the same legal position as a child born in wedlock." *In re Cabrera*, 21 I. & N. Dec. 589, 591 (B.I.A. 1996); *see also Iracheta*, 730 F.3d at 425 (endorsing this definition). Legitimation requires a formal act. *See Miller v. Albright*, 523 U.S. 420, 440–41 (1998). A child may be legitimated under the laws of either the child's or the father's domicile—whether in the United States

6

No. 16-41413

or elsewhere.[6] Both Gonzalez–Segura and his father resided in Tamaulipas, so the laws of that state govern his legitimation claim.

The 1961 Civil Code of Tamaulipas ("CCT")[7] establishes how a father can legitimate a child who was born out of wedlock.[8] CCT Article 370 provides that a child may be legitimated by either (1) the father's voluntary acknowledgment or (2) a court judgment declaring paternity. CCT Article 379 provides five ways that voluntary acknowledgement of a child born out of wedlock can occur:

I.      In the birth certificate before the Civil Registry official;
II.     By special acknowledgement proceeding before the same official;
III.    By a notarial instrument;[9]
IV.     By a will;
V.      By direct and express judicial confession.

---

[6] This is derived from the INA's statutory language. That is, under Title III of the INA, "child" includes "a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in the United States or elsewhere." INA § 101(c)(1) (1952); *see Iracheta*, 730 F.3d at 423 ("[The petitioner] was born and resided in the Mexican state of Tamaulipas, and it is the laws of that state which govern his claim of legitimation.").

[7] The governing version of the CCT was in place from October 24, 1961 to January 31, 1987. The primary resource informing this discussion is a report by the Law Library of Congress. The Law Library of Congress, *Tamaulipas, Mexico: Legitimation of a Child*, LL File No. 2012-008314 (2012).

[8] The CCT's Fifth Title includes a chapter entitled "Of Legitimation" and a chapter entitled "Of the Acknowledgement of Children Born Out of Wedlock." Previously, our Circuit rejected the argument that only the "Of Legitimation" chapter should govern claims to legitimation. *See Iracheta*, 730 F.3d at 426 (rejecting the argument that "a mere textual distinction between 'acknowledgment' and 'legitimation' in the foreign law should be controlling," because "the rights granted to the children are the same"). Instead, both chapters provide avenues by which a child born out of wedlock may be legitimated.

[9] The parties largely agree on this interpretation of CCT Article 379, with the exception of "a notarial instrument." CCT Article 379 lists as its third option for proof the use of an "escritura pública." Gonzalez–Segura's expert translated "escritura pública" to mean "public document." The Government's expert translated the word to mean "notarial instrument." The Government also provided a translation from a Law Library of Congress report, which translated the phrase as "public instrument (notarized document)." The district court concluded that "escritura pública" "translates to a public instrument, specifically one that is executed before a Mexican notary public." On appeal, Gonzalez–Segura again interprets the phrase as "public document." We endorse the Government's interpretation.

Gonzalez–Segura believes that he satisfies the CCT legitimation requirements in three ways. First, his amended birth certificate qualifies as a voluntary acknowledgment of his paternal lineage. Second, the 2007 ruling by the Tamaulipas court that ordered the rectification of his original birth certificate qualifies as a court judgment declaring paternity. Third, his father's 1970 holographic will qualifies as a voluntary acknowledgement of paternity.

### b. Timing requirement

The INA also requires Gonzalez–Segura to prove his paternity by legitimation before he turned twenty-one years old. A child born out of wedlock can establish derivative citizenship "if the paternity of such child is established *while* such child is under the age of twenty-one years by legitimation." INA § 309(a) (emphasis added). The word "while," used as a conjunction, means "during the time that."[10] And, as discussed, legitimation entails "the act of putting a child born out of wedlock in the same legal position as a child born in wedlock." *Iracheta*, 730 F.3d at 425 (quoting *Cabrera*, 21 I. & N. Dec. at 591). Thus, under INA § 309(a), a child born out of wedlock must prove he was formally placed in the same legal position as a child born in wedlock during the time that child is under twenty-one years old.

## B.    Evaluating Gonzalez–Segura's Citizenship Claim

Gonzalez–Segura asserts that three pieces of evidence support his claim to derivative citizenship: his amended birth certificate, the accompanying judicial decree regarding his birth certificate, and the 1970 holographic will. Only the amended birth certificate and the 2007 judicial decree are valid forms of legitimation under Tamaulipan law. Yet, Gonzalez–Segura cannot rely on these otherwise valid forms of legitimation for his claim to derivative

---

[10] The Oxford English Dictionary (online ed. 2017), available at http://www.oed.com/view/Entry/228336?rskey=VgaQH0&result=3&isAdvanced=false#eid.

citizenship because the legitimation occurred *after* he had turned twenty-one years old. Thus, he cannot overcome the INA's timing requirement. Also, his father's 1970 holographic will fails to meet a number of formal, legal requirements necessary for its validity. Thus, he cannot rely on the 1970 holographic will to prove his paternity by legitimation.

### 1. Amended Birth Certificate

Gonzalez–Segura asserts that his birth certificate legitimates him. We acknowledge that a valid birth certificate registered with a Civil Registry official is a recognized legitimation method. However, only *after* the Tamaulipas court's 2007 ruling—ordering that his 1972 birth certificate be corrected—can his birth certificate be used for legitimation. Plainly, this violates the language of the INA; legitimation occurred after Gonzalez–Segura had turned twenty-one years old.

To overcome this, Gonzalez–Segura argues that the 2007 decision rectifying his birth certificate should retroactively apply. Giving the rectification ruling retroactive effect would mean that Gonzalez–Segura was legitimated as of 1972. In other words, we should treat Gonzalez–Segura's birth certificate as if it had always listed Nicolas Gonzalez as his father. Thus, he would have been legitimated before turning twenty-one years old—satisfying the INA's timing requirement—so he could claim derivative citizenship.

The Government disagrees for three reasons. First, giving retroactive effect to the ruling contravenes the plain language of INA § 309(a). Second, Gonzalez–Segura's interpretation undermines Congress's intent behind the statute. Third, U.S. law should take precedence over Mexican law regarding whether the court's determination should apply retroactively.

We conclude that the rectified birth certificate should not be given retroactive effect because the rectification occurred after Gonzalez–Segura had

turned twenty-one years old. This follows from the plain language of the statute. INA § 309(a) requires that a child born out of wedlock to establish derivative citizenship "if the paternity of such child is established *while* such child is under the age of twenty-one years by legitimation." (emphasis added)).

Gonzalez–Segura attempts to persuade us that the statute contains an implied exception that permits a party to prove legitimation *after* age twenty-one if a party identifies fraud or clerical errors in the original legitimation document. He believes allowing retroactive legitimation in that circumstance is consistent with the statute's language, purpose, and our caselaw.

However, we do not read INA § 309(a) as contemplating such an implied exception. The plain language of the statute does not leave room for an exception, nor are we persuaded to imply one in this case. INA § 309(a) requires that the legitimation of a child born out of wedlock occur before the child turns twenty-one years old. A later act of legitimation—even one that retroactively applies a court ruling—does not suffice. Nothing in our caselaw compels a contrary conclusion.[11] Because the act of legitimation occurred when Gonzalez–Segura was thirty-eight years old—seventeen years too late—he cannot claim derivative citizenship under INA § 309(a).

---

[11] Gonzalez–Segura relies on *United States v. Esparza*, 678 F.3d 389 (5th Cir. 2012), and *Bustamante–Barrera v. Gonzales*, 447 F.3d 388 (5th Cir. 2006), to support his position. Those cases involved determining what effect we should give to *nunc pro tunc* orders—i.e., orders given retroactive application—in the immigration context. Both cases left open the possibility that we could retroactively apply a judgment in order to bolster a citizenship claim. *See Esparza*, 678 F.3d at 396 ("[I]t may be possible for a future criminal defendant to use a nunc pro tunc decree to raise a reasonable doubt as to his status as an alien."); *Bustamante–Barrera*, 447 F.3d at 401 (recognizing that "there could be a situation in which such a *nunc pro tunc* amended decree could enhance an alien's claim of derivative citizenship under § 1432(a)."). However, neither case addresses the INA provisions at issue in this case, nor do they explain the circumstances in which a *nunc pro tunc* decree should be given retroactive effect in the context of a derivative citizenship claim.

No. 16-41413

This conclusion aligns with the D.C. Circuit's approach in *Miller v. Christopher*, 96 F.3d 1467, 1473 (D.C. Cir. 1996), *aff'd sub nom. Miller v. Albright*, 523 U.S. 420 (1998). Miller sought to establish derivative citizenship on the basis of a court ruling that retroactively legitimated her parental lineage after she had turned twenty-one years old—much like Gonzalez–Segura. The D.C. Circuit rejected her attempt. We find the D.C. Circuit's opinion instructive.

Miller was born out of wedlock in the Philippines. *Id.* at 1468. She sought derivative citizenship under INA § 309(a),[12] alleging that her father was a U.S. citizen. *Id.* She was over twenty-one years old when she sought to register as a U.S. citizen. *Id.* The State Department denied her application because she failed to legitimate her paternity before she was twenty-one years old. *Id.* Following the rejection, her father "obtained a Voluntary Paternity Decree from a Texas state court, establishing that he was Ms. Miller's biological father." *Id.* at 1468–69. She then sought judicial review of her claim to citizenship.[13] *Id.* at 1469. On appeal, she argued that she met the INA's derivative citizenship requirements because the Texas state court's paternity decree "retroactively legitimated her as of the date of her birth." *Id.*

The D.C. Circuit, focusing on the statute's plain language, succinctly rejected Miller's argument that the paternity decree should apply retroactively. *Id.* at 1472–73. The court noted that "Miller obtained the paternity decree after she turned 21," *id.*, but INA § 309(a) required legitimation while she was under twenty-one years old. *Id.* at 1472–73. The D.C. Circuit explained that, "[t]o allow Ms. Miller to gain the retroactive

---

[12] The D.C. Circuit's opinion refers to 8 U.S.C. § 1409(a) (1994).

[13] Miller argued that the statutory requirements she needed to follow violated the Equal Protection Clause. *Miller*, 96 F.3d at 1469. After the district court dismissed her case for lack of standing, she appealed the issue to the D.C. Circuit. *Id.*

benefit of a state court judgment would undercut Congress's clearly stated requirements and would have the effect of establishing citizenship in ways inconsistent with federal legislation." *Id.* at 1473. Thus, the court held that Miller failed to satisfy the statutory legitimation requirement, so she could not claim derivative citizenship. *Id.* While Gonzalez–Segura attempts to distinguish *Miller* on the ground that the D.C. Circuit considered a different type of decree—a judgment from a Texas state court, as opposed to a foreign judgment—he fails to explain how such a distinction should lead us to a different conclusion.

We conclude that Gonzalez–Segura's rectified birth certificate cannot satisfy INA § 309(a)'s timing requirement, and we decline to give his birth certificate retroactive effect in order to allow him to satisfy that requirement.

### 2. The Tamaulipas Court's 2007 Paternity Decree

Gonzalez–Segura asserts that the 2007 judicial decree rectifying his birth certificate is a "judgment declaring paternity" within the meaning of CCT Article 370, so it counts as an act of legitimation that can establish his derivative citizenship under INA § 309(a). The Government argues that the same reasons the rectified birth certificate should not be given retroactive application apply to the 2007 judgment. Gonzalez–Segura does not explain why—if we do not grant the birth certificate retroactive application—we should nonetheless grant the 2007 judgment itself retroactive application. We decline to give the rectified birth certificate retroactive application to legitimate Gonzalez–Segura, so it follows that the 2007 decree should not be given retroactive application.

### 3. The 1970 Holographic Will

Gonzalez–Segura also argues that the 1970 holographic will legitimates him under the CCT. Gonzalez–Segura asserts that his expert's report—presented on appeal—demonstrates the 1970 holographic will's sufficiency

under Tamaulipan law to legitimate him. Gonzalez–Segura included the expert's full report in his brief before the panel. The thrust of the report is that the Government's expert failed to consider how the Tamaulipas Code of Civil Procedure affected the validity of the holographic will. Under that code, the holographic will could have probative value because it is an extrajudicial confession that is contrary to its author's interests. Gonzalez–Segura's expert concluded that the holographic will was an extrajudicial confession contrary to Nicolas Gonzalez's interests, so it can legitimate Gonzalez–Segura. The Government finds Gonzalez–Segura's argument both procedurally and substantively flawed. We conclude that the holographic will failed to comply with the requirements of the CCT, so the document cannot be used to legitimate Gonzalez–Segura. Before discussing the substantive flaws with the document, we will first address the Government's complaints about how Gonzalez–Segura presented his expert's report.

### *a. Procedural flaws*

The Government contends that Gonzalez–Segura's argument on appeal relies on an expert report that was not in the record below. The Government explains that Gonzalez–Segura attempted to introduce the report into evidence as an attachment to its July 2016 Motion for Leave to Redesignate Expert Witness. The Government filed an opposition to the motion soon after. The district court, in its order granting the Government's motion for summary judgment, denied the motion as moot. According to the Government, this means the expert report was not included in the summary judgment record. On appeal, the Government contends that the panel's inquiry "is limited to the summary judgment record before the trial court: the parties cannot add exhibits, depositions, or affidavits to support their positions on appeal, nor may the parties advance new theories or raise new issues to secure reversal." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 n.10 (5th Cir. 1992). Thus, Gonzalez–

No. 16-41413

Segura cannot add a new expert report. Gonzalez–Segura's defense of the 1970 holographic will relies exclusively on the expert report.

Gonzalez–Segura, of course, disagrees. First, he contends that the report was before the district court—and part of the summary judgment record—because it was presented as an attachment to a motion. Although the district court denied the motion as moot, the legal argument was still before the court. Gonzalez–Segura also argues that when a court is reviewing foreign law de novo, it may consider new material presented on appeal. He cites our decision in *Iracheta* in support. 730 F.3d at 424 ("On appeal, the government presents an August 2012 Library of Congress report clarifying the legitimation laws of Tamaulipas, Mexico. [The Petitioner] additionally cites a 2004 report . . . . We have reviewed these materials and have considered the arguments of the parties regarding their meaning." (citations omitted)). We conclude, following *Iracheta*, that it is appropriate to consider Gonzalez–Segura's presentation of an expert report regarding the interpretation of Tamaulipan law—although he first presented the report on appeal.

### b. Substantive flaws

The Government contends that despite Gonzalez–Segura's expert report, the 1970 holographic will does not legitimate him. The district court determined that CCT Title Three, Chapter IV, Articles 1444–1451 establish the requirements for validly creating a holographic will. The district court derived its interpretation from the Government's expert, who outlined eleven requirements:

> [1.] the testator must be an adult, Art. 1445;
> [2.] the holographic will must be fully written by the testator in his or her own hand and signed by the testator, Arts. 1444 & 1445;
> [3.] the holographic will must state the day, month and year in which it was granted, Art. 1445;
> [4.] the testator must create an original and a duplicate copy of the holographic will, Art. 1447;

14

[5.] the testator must imprint his or her thumbprint on the original and duplicate copy of the holographic will, Art. 1447;

[6.] the original and duplicate copy of the holographic will must each be placed inside closed and sealed envelopes which then must be taken by the testator personally to the offices of the Public Property Registry, Arts. 1447 & 1448;

[7.] if the registrar in charge of the Public Property Registry does not know the testator, the testator must present 2 witnesses who shall identify him, Art. 1448;

[8.] the original of the holographic will must be deposited by the testator at the Public Property Registry, Art. 1444;

[9.] on the envelope containing the original, the testator, by his own hand, shall write "*My Will is contained in this envelope*" and shall write the place and date on which the deposit is made and then he, the registrar and the 2 witnesses shall sign the envelope, Arts. 1447 & 1448;

[10.] the registrar is to write the following statement on the envelope containing the duplicate copy of the holographic will: "*I received the sealed envelope that Mr. _____ is claiming to contain the original of his holographic Will, of which, according to claims made by said man, there is a duplicate copy in this envelope.*"; the registrar is then to write the place and date on the envelope and the registrar, testator and 2 witnesses shall sign the envelope, Art. 1449; and

[11.] after the deposit is made, the registrar shall retain possession of the original holographic will and make an appropriate notation thereof in the records of the Public Property Registry, Art. 1451.

The 1970 holographic will fails to fully satisfy these requirements. At most, the document satisfied only the first three requirements for drafting a valid holographic will. Gonzalez–Segura apparently concedes this, arguing instead that the holographic will is valid under the Tamaulipas Code of Civil Procedure.

Yet, his reliance on the Code of Civil Procedure is misplaced. The Code of Civil Procedure, as Gonzalez–Segura's expert explains, pertains to the probative value of written statements. That is, the Code of Civil Procedure governs the use of the holographic will for proving certain facts in court—not

whether the 1970 document is a valid holographic will. Even if the document may be probative of Nicolas Gonzalez's belief in his parentage, that does not render the document a valid holographic will. Second, the expert notes that the document is "legally sufficient to prove statements asserted therein so long as those statements are in opposition to the interest of the person who made the assertion." But the expert does not explain coherently how the statements contained in the 1970 holographic will are contrary to Nicolas Gonzalez's interests.[14] Therefore, the CCT governs the 1970 holographic will's validity as a device for proving Gonzalez–Segura's legitimation, and Gonzalez–Segura failed to prove the 1970 holographic will's validity.

## V. CONCLUSION

We AFFIRM the district court's grant of summary judgment. Under the plain language of the former INA, Gonzalez–Segura cannot prove as a matter of law that he was legitimated before turning twenty-one years old. Thus, he cannot claim derivative citizenship.

---

[14] The expert's argument that a land conveyance was contrary to Nicolas Gonzalez's interests may be true if Nicolas transferred real property inter vivos. The argument does not carry as much weight in the situation of a will that takes effect on death; upon death, Nicolas would have no interests other than those expressed in his will.